### MASSARI v. FOREST LUMBER CO. (PADROSA, Intervener).

(District Court, S. D. Florida. June 5, 1923.)

No. 776.

1. **Shipping ⬡⇒43—Charter held to contemplate voyage before tendering vessel.**

   Charter, executed September 18th, of vessel "now at Tampa," for a voyage to Cuba, the vessel "to be ready about October 15th" for loading, *held* to contemplate that the vessel, between the time of chartering and her report for loading, should engage in other business, such as another voyage to Cuba, although the words "all possible dispatch in ballast to enter upon this charter" were not stricken out.

2. **Shipping ⬡⇒43—Construction by parties as to time for loading followed.**

   Where charter was executed September 18th of vessel "now at Tampa," to be ready "about October 15th" for loading, and on October 6th the broker wrote the charterer that the vessel would be ready to load on October 20th, and requesting a loading dock be named, and in response thereto the charterer wrote October 8th, naming the dock, *held* that this was a practical construction of the provision "about October 15th," so that the charterer could not claim that tender of the vessel on October 22d, after a preliminary voyage and necessary repairs, was not a compliance.

3. **Admiralty ⬡⇒70—No technical rules of variance.**

   In admiralty, although the proofs should substantially conform to allegations, to prevent surprise, there are no technical rules of variance or of departure in pleading, as at common law.

4. **Shipping ⬡⇒58(3)—Damages for charterer's breach stated.**

   For charterer's breach by refusing vessel tendered, the measure of damages is the amount of the freight money reserved in the charter, less the expense incurred in earning it.

5. **Shipping ⬡⇒58(3)—Approximate accuracy of damages from breach of charter sufficient.**

   Where charterer breaches charter by refusing to accept vessel tendered, the damages are necessarily uncertain, and approximate accuracy of showing the damages suffered is sufficient.

⬡⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**6. Shipping ⬤⟲58(2)—Ownership of lumber attached held shown to be in defendant corporation, not in its president.**

In libel for charterer's breach by refusing vessel tendered, evidence *held* to show that lumber attached by libelant was owned by defendant corporation, and not by its president, who interposed claim thereto.

In Admiralty. Libel by A. Massari against the Forest Lumber Company, in which B. Padrosa intervened. Decree for libelant.

N. B. K. Pettingill and Macfarlane & Macfarlane, all of Tampa, Fla., for libelant.

Whitaker, Himes & Whitaker, of Tampa, Fla., for respondent and intervener.

CALL, District Judge. A libel in personam was filed October 23, 1920, by libelant against the respondent, and service upon the respondent obtained through an attachment of certain lumber in Tampa, Fla. The libel alleges that the schooner Fannie & Fay, was on September 18, 1920, chartered to the respondent, the Forest Lumber Company, of Brunswick, Ga., for a voyage from Tampa, Fla., to Havana, Cuba, loaded with yellow pine lumber at a freight of $25 per thousand superficial feet; that at the date of the signing of the charter party the schooner was at Tampa, Fla., and she was about to sail with cargo for Havana, Cuba, and because of such contemplated voyage the charter party provided that said vessel was "to be ready about October 15, 1920," for loading by respondent; that the vessel performed the contemplated voyage and returned to Tampa on the 17th of September, 1920; that during said voyage the vessel suffered such damage from the perils of the sea as necessitated placing her in the dry dock for repairs; that such necessary repairs were made with due diligence; that on the morning of October 22d the vessel was placed at the designated dock ready to receive the cargo; that on October 22d respondent was not prepared to furnish the cargo; that respondent refused to furnish the cargo to load the vessel, but repudiated the charter and all obligations thereunder, because of the delay in furnishing the vessel, which was from October 15th to October 22d, and seeks damages for such breach.

The answer of respondent admits that the charter party was made on September 18, 1920, copy of which is attached to the libel; admits that before the schooner was tendered for loading, and subsequent to the making of the charter party, she made a voyage from Tampa to Havana and returned, and that the schooner was tendered for loading on October 22, 1920, and on account of such delay, from October 15th to October 22d, it declined to load said vessel, or to carry out the terms of the charter. The respondent denies that the charter was negotiated through John J. Earle as agent or broker of respondent; denies that it knew or had notice that the schooner, at the time of making the charter, and before performance of it, was about to sail or make a voyage to Havana, Cuba, and return; denies that the clause "vessel to be ready 'about 15th'" was inserted because of such contemplated voyage, known to it, or of which it had notice; denies any knowledge as to the date the schooner returned to Tampa, or whether the vessel

was damaged by the perils of the sea on such voyage, or that by reason of such damage any repairs, or the repairs in the libel mentioned, were necessary, or that such repairs were made with due diligence, but demands strict proof of same; denies that the vessel diligently returned to Tampa. The answer then alleges that the libelant breached the charter party, in that subsequent to making the charter he loaded the schooner at Tampa and sent her on a prior voyage to Havana, before reporting for loading under the charter, and did not tender her until October 22d, instead of October 15th. It further alleges that on October 20th a telegram was sent to Earle canceling the contract.

The charter signed by the parties is one of the printed forms filled in and contains these words typewritten, "Vessel now at Tampa, Florida." The printed words "It is understood that this vessel is bound from [blank space] to [blank space] and after discharge of cargo will proceed with" are erased by having an ink line run through them, and "all possible dispatch in ballast to enter upon this charter" on the line below the erased words, but constituting the remainder of the sentence, are not erased. It is contended on the part of libelant that these last words must be ignored in arriving at the intent of the parties in making the contract; that the failure to erase them when erasing the prior part of the sentence was an oversight, and the fact that they remained in can have no application to the fact of the vessel being then in Tampa, and not being required to be ready to load until October 15th, when the charter was made September 18th. It seems to me that this contention is more reasonable than that the parties intended by leaving in the words to have the vessel there at Tampa with "all possible dispatch in ballast" to proceed to the dock to load in Tampa.

[1] Again, it does not seem to me to be reasonable that the parties could have intended to have the vessel lie idle in Tampa from September 18th to October 15th. The more reasonable construction appears to me to be that it was in the contemplation of the parties at the time of making the contract, and when vessels were in demand for the Cuban trade, that the vessel, between the time of making her charter and her report for loading, should engage in other business. The Harbinger (D. C.) 50 Fed. 941. The contract is to be construed according to the intention of the parties, gathered from the language of the particular instrument, and which particular stipulations are conditions precedent depends upon this intention as gathered from the instrument itself. Lowber v. Bangs, 2 Wall. 736, 17 L. Ed. 768. Applying this test to the charter in this case I am satisfied that the quoted printed words not stricken out must be considered as stricken out, or surplusage. 1,000 Bags of Sugar v. Harrison, 53 Fed. 828, 4 C. C. A. 34. Therefore there was no condition precedent in this case for the vessel to go to the loading dock with "all possible dispatch in ballast to enter upon this charter."

[2] The charter between the libelant and respondent was entered into September 18, 1920, for the affreightment of the schooner Fannie & Fay, for a trip from Tampa to Havana, to be loaded with yellow pine lumber or boards, either rough or dressed, at $25 per thousand, superficial feet, to be paid at the port of discharge, with the usual

covenant of seaworthiness. The vessel to be ready "about October 15, 1920." Subsequent to the making of this charter the vessel loaded with lumber and made a voyage to Mariel, Cuba, and returned to Tampa on October 18th, where she was put upon the dry dock for needed repairs to make her seaworthy, and tendered to charterer October 22d, when charterer refused to load because of the delay from October 15th to October 22d. On October 6th charterer was notified that the vessel would be ready for the cargo on October 20th and asked to designate the dock at which she would be loaded; on October 8th in reply charterer designated the loading dock; October 22d she was tendered to charterer at the designated dock. The vessel was of some 198 net tons, with a capacity of from 160,000 to 165,000 feet of rough lumber, and from 170,000 to 175,000 feet of dressed lumber.

The libelant contends he ought to recover because (1) the charterer had notice that the vessel was engaged for a voyage to Cuba; and (2) that, if he did not have this notice, it was within the contemplation of the parties when making the contract or charter that the vessel would not lie idle from September 18th to October 15th following. To support his first contention he maintains that Earle, who negotiated the charter, was the agent or go-between of both parties, and his knowledge must be ascribed to the respondent, and, if not that, then the agent Mitchelson of the respondent knew that the vessel was then at Tampa, and discussed the procuring of the charter with Earle. Earle was informed by respondent that Mitchelson would be in Tampa on September 11th in connection with the charter of two barges to be loaded for Cuba. While there some conversation evidently was had between them in regard to the charter of the John Francis and probably the Fannie & Fay. But I cannot find that Mitchelson was authorized to bind the respondent as to any negotiations for the charter of the Fannie & Fay. The freight per thousand feet must have been arranged or understood. The correspondence shows that Earle approached the libelant with the suggestion that he could get $25 per thousand freight money, and after receiving notice of the intended voyage to Mariel, Cuba, and the owner's desire to charter the vessel after its completion, then made the offer to respondent, without informing it of the voyage to Mariel, and the charter was later made, pursuant to this offer. Under the circumstances shown in the testimony I cannot find that Earle so represented the charterer that notice of the intended voyage to him would be notice to the charterer, nor can I find that Mitchelson knew of such intended voyage. But in the view expressed above the decision of these questions becomes unimportant.

The charter provides that the vessel shall be ready to load about October 15th, and she was not tendered to charterer until October 22d, and on account of this delay alone charterer declined to carry out the charter and to load the vessel. The word "about" has been commented upon and construed in many cases. I am impressed that both parties were uncertain as to the exact date the vessel would be ready to load, and for that reason an exact date was not named in the charter. But in any event I find in the testimony that the parties by their ac-

tions construed this provision of the charter. As before noted, on October 6th, Earle addressed a communication to charterer, informing it that the vessel would be ready to load on October 20th, and requesting that a loading dock be named. In response, on October 8th, charterer named the dock. These words are used, "Starbuck will take the boat, and he will begin loading her, as we have some lumber at his dock." The explanation, offered by the witness when testifying, that he thought he had to wait until the vessel was tendered before he refused it, is contradicted by his letter of the 8th. Thus a construction of the provision of the charter party was placed upon it by the parties, and as said in Sanders v. Munson, 74 Fed. 651, 20 C. C. A. 581, this construction will be frequently followed, where the terms are ambiguous, when seeking the intent of the parties. In the case of Bennett v. Lingham (D. C.) 31 Fed. 86, Judge Benedict says:

"After this interpretation of the indefinite phrase 'about the middle of September,' acquiesced in by the defendant, * * * it was not open to the defendant to say that a tender of the ship * * * was not a compliance with the contract."

And this statement seems to me to apply to the instant case. On October 6th, when informed that the vessel would be ready to load on October 20th, instead of requiring her to be tendered it on the day named in the charter, it gave its consent to such construction by naming Starbuck's dock as the place to load. In the words of Judge Benedict, it was not open to the charterer on October 20th, after acquiescing in the construction of the words "about October 15th," to say that the tender of the vessel was not a compliance with the contract.

The answer of the respondent requires strict proof of the injury to the vessel and necessity of repairs, and the diligence in making same, and diligence in returning from the port to which she had gone. These matters seem to me to be covered by the evidence in the case, and require a finding in favor of the libelant on these points, which I do.

[3] The libel alleges that the vessel made a voyage to Havana, when the proofs show the voyage was made to Mariel, situated a short distance from Havana. Some stress was laid in argument upon this variance, and thereupon libelant asked to amend his libel in this particular to correspond to the proof. I do not deem the amendment necessary, as it seems to me immaterial whether the voyage was made to Havana or to a nearby port. The question was whether the vessel could make any voyage before entering upon the charter, which would reasonably make her return too late to be ready to load on October 15th under this charter, and that question I have resolved in favor of the libelant; Again, the answer admits the voyage to Havana, and there was no issue before me to which to apply the testimony.

"In the courts of admiralty of the United States, although the proofs of each party must substantially correspond to his allegations, so far as to prevent surprise, yet there are no technical rules of variance, or of departure in pleading, as at common law." The Gazelle and Cargo, 128 U. S. 487, 9 Sup. Ct. 142, 32 L. Ed. 496.

I am therefore of opinion that respondent breached the charter party in refusing to load the vessel.

[4, 5] The measure of damages, as I understand the law, is the amount of the freight money reserved in the charter less the expense incurred in earning it. This must, in the case where the voyage is not performed, be uncertain to some extent; but this is not the fault of libelant. Approximate accuracy of the damages suffered by reason of the breach is all that can be expected.

The proofs show that the vessel would carry, when fully loaded, from 160,000 to 165,000 superficial feet of rough lumber. I think, therefore, an allowance of 160,000 feet would be the proper basis for calculation. This at $25, the charter rate, would produce gross $4,000. From this amount should be deducted the probable expense of the trip, amounting to approximately $1,000, leaving amount of the decree $3,000.

[6] The attachment in this case was served by the seizure of the cargo on two certain barges, a lot of lumber on one dock of about 15,-000 feet, and a third lot of some 50,000 feet. A claim was interposed by Benito Padrosa to the lumber on the two barges and the 15,000 feet on the dock of Denton-Shore Company, and stipulation for the release of said lumber given in the sum of $10,500. The 50,000 feet attached on the Starbuck dock was sold under the order of the court, and the proceeds, amounting to $675, deposited in the registry of this court to the credit of this cause.

Proctor for libelant contends that the testimony shows the lumber claimed by Padrosa is the property of respondent, and the stipulation given by Padrosa should be made to respond to any deficiency in the decree remaining after the application of the amount in the registry of the court to the costs of this suit and the amount of the decree. The decision of this question depends upon the ownership of the lumber.

The libelant depends for his contention on the facts produced in evidence of the charter of the two barges by the respondent on which the lumber was laden; the telegram to Earle by the respondent that Mitchelson would be in Tampa concerning the charter of these barges and the schooner John Francis; the fact that bills of lading were not issued in the name of Padrosa until after the lumber was attached. Padrosa, to sustain his claim, produces documents showing a purchase by him individually of the lumber from the Hughes Lumber Company, at Jacksonville, Fla., and testifies that the purchase was made on his individual account and paid for with his individual funds; that the respondent had never had any interest in the lumber.

The claimant was president of respondent and one other lumber company; was in the same business himself individually with European correspondents. One of the corporations was engaged in lumber and the other in cross-tie business, engaged almost exclusively in the Cuban trade. Padrosa testifies that Mitchelson was in his employ individually, not in the employ of the respondent; his salary paid by Padrosa, and no part contributed by the respondent. No explanation is offered as to why Padrosa, whose individual business was with European correspondents, should have engaged in the Cuban trade with barges chartered by the respondent, after the purchase of the cargo of the John Francis, which cargo was shipped on these barges to Cuba.

Some explanation is attempted as to why the bills of lading were not sooner taken out; but the fact is that the correspondence shows that inquiries as to the tug to tow the barges were made by the respondent, the charter taken in respondent's name, Mitchelson sent to Tampa by the respondent to negotiate with Earle about such charters, and Padrosa personally does not appear in any of these transactions until the cargoes are attached. He signed the charter as president of respondent, and appears interested only as such president, up to the time of the attachments.

Under the circumstances, it seems to me, the testimony should show beyond suspicion the individual ownership of Padrosa before he could prevail in his claim, and that in the instant case such proofs have not been tendered. I find, therefore, that the claimant has not proven his claim. I am therefore of opinion that the contention of libelant must prevail, and the stipulation filed by claimant held to respond to the decree to be entered herein for any deficiency there may be in the payment of the decree and the costs of proceeding.

A decree in conformity with this opinion will be entered.